# JACK DOWELL v. STATE.

No. A-9574.  Oct. 12, 1939.
(94 P. 2d 956.)

Harry C. Kirkendall, of Enid, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., and Jess L. Pullen, Asst. Atty. Gen., for the State.

DAVENPORT, J. Jack Dowell was by information jointly charged with Douglas Haltom with the crime of burglary by breaking and entering a building at 1106 East Broadway street in the city of Enid, Okla., said building being occupied and in the possession of J. R. Collins; was jointly tried, and both defendants found guilty and sentenced to the penitentiary for a term of two years. From the judgment and sentence, Jack Dowell has appealed.

In substance the testimony of the state is as follows: That the defendant Jack Dowell and Douglas Haltom broke and entered a building occupied by J. R. Collins, located at 1106 East Broadway street in Enid, Okla. The testimony of the state fixes the exact time of the alleged burglary as being 13 minutes before 6 o'clock on the morning of January 23, 1938. They fix the time definitely by an electric clock which stopped when the cord was pulled and disconnected at 13 minutes until 6 o'clock on the morning of January 23, 1938; that the person who committed the burglary entered through a window, which necessitated breaking the cord. The burglary was discovered by a police officer about 7:30 or 8; the police officer observed a peculiar car track near the place that was robbed, in a driveway which is used by taxi cabs, customers of the place of business, and any one else who has occasion to drive through this driveway. That on the night of the alleged burglary, Jack Dowell and Douglas Haltom were driving a car having a tread similar to the tread of a car casing seen in the alley near the Collins place of business that was burglarized.

Howard Russell, who worked for Collins at his place of business, known as Jim's Barbecue, testified for the state, stating that it was his duty to open the place of a morning; that the night before he checked the windows and doors,

and the light was on. The witness then described in detail the lights operating the electric clock, and the condition of the roadway around the barbecue place, known as Jim's Barbecue, owned by J. R. Collins.

William Hill testified as to being counter-boy and curb-hop, and stated how the place was closed and locked.

John Curry stated that he worked at Jim's Barbecue, and that he arrived at the place on the morning after the burglary, 5 or 10 minutes after 6 o'clock, a.m.; that he saw a piece of glass with a brown substance on it that looked like it might have been blood. The witness also stated that the electric clock stopped at 13 minutes until 6 o'clock.

John Coppock testified for the state that he owned a Ford V8, 1934 coupe, black in color; that he was drunk the night before, and had Jack Dowell drive his automobile; that they visited a number of places the night before, but were nowhere near Jim's Barbecue place. He stated that he had on his car what is known as a regrooved tire; between 2 and 3 o'clock in the morning he got so drunk that he passed out, and did not know anything for sometime.

Buddy Kiely, testifying for the state, stated that he was with Jack Dowell in Coppock's car, and went into detail as to the different places they visited that night; and further stated that they returned to Perry's Cafe about 5 o'clock; that about 5:30 Jack Dowell and Douglas Haltom left Perry's Cafe, to take Shorty Allen home; that he remained at Perry's Cafe; that he heard the conversation between Allen and Dowell, when Allen wanted him to take him home; that Perry Lee Randolph was in the cafe at the time; that she got off duty at 6 a.m.; and that she came back to the booth where he was sitting.

Everett Allen, known as Shorty Allen, testified for the state that Jack Dowell and Douglas Haltom took him from Perry's Cafe to his home; that he left Perry's Cafe at 5:25;

that he lived at 1906 North Grand, and that it was north from Perry's Cafe a distance of 17 blocks.

Albert Seidel testified for the state that he lived at 703½ East Broadway; that he was working at a filling station, and that about 6 o'clock he was walking on East Broadway, and observed an automobile; he noticed it was a Ford V8 coupe, dark in color, near Eleventh street; but did not identify any particular car. When he first saw the car, it was about four blocks away. Later it passed him while he was walking down the street.

Floyd Kelley testified that he was a policeman in the city of Enid, and that he arrived at Jim's Barbecue about 10 or 11 o'clock, and discovered where the glass had been broken out of the door, and that he saw automobile tracks in the driveway; that about Tuesday or Wednesday after he had seen these tracks in the driveway, he discovered a car with casings on it that he thought would fit in the imprint made near Jim's Barbecue stand.

Earl Moore, a witness for the state, stated he was a police officer; that he arrived at Jim's Barbecue stand about eight o'clock, and observed the place had been burglarized; that he noticed a peculiar car tread in the soil near the stand, and described the tread.

Neal Oliver says he got to Jim's Barbecue between 7:30 and 8 o'clock with Casey Mills; that they found a peculiar print of car tracks.

Casey Mills, a witness for the state, testified that he drew a picture of the imprint in the mud.

John Anderson, a witness for the state, says that he is a tire man, and that he regrooved a tire four or five months prior to the alleged offense for John Coppock.

Carl Hubbard, a witness for the state, stated that he arrested Jack Dowell about five o'clock in the afternoon after the robbery at 13 minutes until 6 a. m., and that Dowell asked him if he could leave some money with his employer.

Fred Brackhage testified to arresting Douglas Haltom, and that he had a cut or scratch on his left hand.

Jim Collins was recalled, and testified that Douglas Haltom was left-handed.

Lon Nash, testifying for the state, stated:

"I am Douglas Haltom's father-in-law. I did not know Jack Dowell, but I went to the jail and talked to Jack Dowell. I asked Jack what they did with the stuff they got; and he said not to worry about that, it was out of the state, and gone where no one could find it, and also a handkerchief with Douglas Haltom's initials on it."

Witness Nash also testified to a conversation with Douglas Haltom, saying, "We are on friendly terms, because we never speak; we never bother each other." He testified that his ill feeling against Douglas Haltom was because Haltom had told his daughter to get out.

On cross-examination the witness was asked the following questions, and gave the following answers:

"Q. You tried to play good to him and offered to help him for that, didn't you; didn't you do that; didn't you do that, just kind of agreed to help them out, didn't you? A. Well, I don't know what you mean. Q. Were you wanting to get custody of the goods, or something? Mr. Conway: That is objected to as incompetent, irrelevant, and immaterial. The Court: Sustained. Mr. Kirkendall: Exception. Not if he answers 'No,' it won't reflect on him. Q. You never had seen Jack Dowell before in your life? A. No, sir. Q. He just walked up to you and told you of that? A. Yes, sir. Q. Have you ever been convicted of a crime? The Court: Don't ask that question, unless you have pretty good reason to believe it; it would be improper. By Mr. Kirkendall: Q. Your name is Lon Nash, isn't it? A. Yes, sir. If you will give me an outline of what you are hunting, maybe I can help you. Q. I will ask you if you plead guilty to any crimes? A. What do you call a crime? Q. I am asking you. Referring to case No. 4760, State of Oklahoma, Plaintiff, v. Lon Nash, filed in the County Court of Garfield County, Oklahoma, on October 30, 1938, do you remember that? Mr. Holbird: That is objected to

as incompetent, irrelevant, and immaterial; that date hasn't yet arrived. The Court: The objection is sustained. By Mr. Kirkendall: Q. October, 1928, do you remember that case?"

It is shown that Lon Nash had pleaded guilty to violation of the laws of the state of Oklahoma.

The testimony goes on from this point, and shows that witness Lon Nash had pleaded guilty to a violation of the laws of the state of Oklahoma; and then the record discloses the following fact: As the court did not allow the attorney for the defendant any latitude in the cross-examination of the witness, the defendant's counsel requested to be permitted to cross-examine the witness Lon Nash, and the court denied the request. The attorney for the defendant then stated that he desired to recall the witness to ask him if he had gone to a party by the name of Howard Dyer, and asked him if he did not try to employ him to get information about the burglary of Jim's Barbecue, and say that he would pay Howard Dyer for the testimony.

The court stated: "The state has rested, and you interposed a demurrer"; and then the defendant stated the reason he wanted to recall the witness Lon Nash was to ask him questions for the purpose of laying a predicate to show what action the witness had taken in the case; and the court refused to permit him to do so; and the defendant duly excepted.

When the state rested, the defendant Jack Dowell demurred to the evidence offered by the state for the reason that the same, under the reasonable inferences to be drawn therefrom, does not prove any offense or violation of the law against the defendant. The demurrer was overruled; and the defendant then moved the court to direct a verdict of acquittal against the defendant Jack Dowell, and to discharge him. That motion was overruled; and the defendant duly excepted.

Jack Dowell, the defendant, testifying in his own behalf, stated:

"My name is Jack Dowell. I am one of the defendants. I have been living in Enid since 1926. I am employed by the Black and White Taxi Cab Company. I was working for the same company on the 23rd day of January, 1938. On the night of January 22, and the early morning of January 23, 1938, I quit work about 1 o'clock in the morning. I was at the cab office when I went off duty. That is on West Broadway, 225. I cannot say what drivers were there at the time; but the telephone man was there, also Happy Coppock. I don't know his correct name. 'Happy' is all I know. After I quit work, Happy and I went down to the Coleman Cafe, down by the Rock Island Depot. I judge we stayed 20 to 25 minutes. We then went back to the cab office on West Broadway. During the evening we picked up Buddy Kiely. I had known him about two years, I would say. Happy, Buddy, and myself first went to the Green Lodge, which is out on the east pavement, Locust Grove, and remained out there sometime, and left there, and went to the Nickle Back, which is across from the Peacock on Willow street. They were getting ready to close the Nickle Back, and we did not stay there but a short time. We came to town, down Grand street, and stopped across the street from Perry's Cafe. I got out; and as I wanted to go into the cafe to see who was there, I went inside, then Coppock. Coppock and Kiely came in shortly after I went in. After we left the cafe, we went to the car, and went to the Williams Master Station, and bought two gallons of gasoline. From there we went to the M & M Station. The M & M Station is a place where they sell hamburgers and drinks. We went from there down to McLains Station; but it was closed; and we came back to Perry's Cafe. I would say we stopped at Perry's Cafe about 3:30 in the morning of January 23, 1938. This was the second time we stopped at Perry's Cafe. I was driving the car. When we came back to Perry's Cafe, we parked the car in the alley. Perry's Cafe sets on the south side of the alley, in the 200 block on the east side of the street, on North Grand. I parked there, right up next to the building. There is a railroad track there on the south side of the alley. Perry's Cafe is south of the railroad track. It was Mr. Coppock's car

that I was driving. I took the keys out of the car, and put them in my pocket. As near as I could fix the last time we went in Perry's Cafe was around 5 o'clock; but it could have been a few minutes after. When I went in, I saw the waitresses, and Mart Quertermous, and Merlin Butts. Shorty Allen and Douglas Haltom were with me. I had not seen Douglas Haltom that evening before we went into Perry's Cafe the second time. There were several people in there, when we went in. Between 5 and 5:30, I had a conversation with Shorty Allen. I had driven a cab with Shorty Allen, and knew him personally, and asked him how he was getting along in the cafe. He was drinking quite a bit, and asked me first if I was driving a cab; and I said, 'No; Happy, Buddy, and I are together, and I have been driving Happy's car.' He said, 'I wonder if you could get it to take me home?' I said, 'Yes, I suppose so; I have the keys.' I went over and asked Coppock if he cared if I took Shorty Allen home. He said, 'No.' And I did. Haltom and Shorty were sitting on the stools at the counter. I drove Shorty Allen home; and Douglas Haltom accompanied me. I learned later that he and Allen came in the cafe together. The Coppock car was a 1934 Model Ford V8, color, black with silver wheels. When we started to take Allen home, the car was parked at the same place I left it when I went into the cafe, by the side of the building. I got in the car and backed it out. We went North on Grand to 1906, just about seventeen blocks from Perry's Cafe. I had been to Allen's home before. I have taken him home lots of times in the cab. I drove in the driveway. His house sets up from the street as long as this courtroom. He got out, said a few words, and thanked me for bringing him home, and bid us good night. We then went back down the street to Birch, and somewhere on the way back, I don't know just where, but somewhere along the way, Haltom asked me where I was going; and I said I was going back to Perry's where Happy and the boys were. He said that was all right with him, that he lived right there. We went to Birch Street, and turned one block west to Independence, and down Independence to the north side of the Square, and across the Square to Grand, and back north to Perry's Cafe; and drove up in the alley to identically the same place as before. I did not go any other place on the trip taking Allen home, but to his home, and then came back to Perry's

Cafe. The reason I turned on Birch, I had to get over one block to get to my parking place without driving back a piece. Allen was not with me, as I had taken him home. Douglas Haltom was with me. I locked the ignition, took the key out, and put it in my pocket, and then went into Perry's Cafe. Douglas Haltom did not go in with me; he started across the street northwest. That is where Smith's Cafe is located. When I went in Perry's Cafe, Coppock was still there. He was sitting in the booth where I left him, when I went to take Allen home. It was the second booth from the front. A girl by the name of Perry Lee Randolph was on duty at this time, when I went in. I had known her about four months. She quits work at six o'clock in the morning. Mrs. Davis came in and took her place, when Perry Lee Randolph went off duty. Mrs. Davis came to work about ten or fifteen minutes to six o'clock. That was the morning of January 23, 1938. When Mrs. Davis came in the door we were sitting in the second booth, not far from the door. She looked over and said, 'Hello,' to me; and I spoke to her; and she spoke to Mart. I don't think she spoke to Coppock. She reached over and picked up a dime laying on the floor; and I said something about us sitting there all this time and a dime laying there. She said, 'Yes, I pick up all of them I can.' I didn't look at the clock, but I saw Mrs. Davis come in the door, and saw her pick up the dime, and talked to her about it. After Mrs. Davis went to work, Mart Quertermous and I ordered a bowl of vegetable soup. Mrs. Davis served it to us, the same lady that picked up the dime. From the time Mrs. Davis came in until she served me, I had not been out of the cafe, and had the car keys in my pocket all the time. During the entire time we were out, I did not stop at the barbecue stand of Mr. Collins on East Broadway. I did not break the window out of his building, nor did I steal his cigarettes; and I did not have Douglas Haltom do it. I was arrested about 2:30 in the afternoon. I went into the office to leave some money in there with Roy Smith, who is an employee at the cab stand. I left $16.00 with him. I had worked for this money. I did not know Lon Nash. He came to the jail to see me. I had not seen him before that time. He talked to me at the jail. I was out in the little office. I had been talking over the telephone in a kind of corner back by the stove. Lon Nash said, 'I don't know whether

you know who I am or not.' I said, I didn't; and he said, 'I am Douglas' father-in-law. I came down to talk to you boys about this deal that you and Douglas are in.' I said, 'All right.' He said, 'Jack, it looks kind of bad. They are going to find that stuff you boys got out of there, and if you will tell me where it is, I will get it; they can't do anything about it.' I told him I didn't know anything about it. He said, 'Yes, you do. Doug told me you knew where it was.' I said I knew nothing about it, and as far as I knew it might be out of the United States. He said something about a handkerchief that Douglas lost, and asked me if I knew what became of the handkerchief that Douglas lost. I said I didn't know anything about the whole deal. I walked over by the wall, and asked to be let back inside. Mr. Campbell, the jailor, was sitting up at the desk. Lon Nash said he was Doug's father-in-law, and wanted to help us out."

On cross-examination the witness stated:

"I do not know whether Mr. Campbell, the jailor, heard what I said to Mr. Nash. What Mr. Nash and I talked about was not a private conversation as far as I was concerned. Douglas Haltom was in jail. Mrs. Haltom was present at the time. I knew that Mr. Nash was Douglas' father-in-law; but I did not know it until he made it known to me. I did not know him until the fellow came down there, popping off; and then I did not like my friend. I did not confide anything to Mr. Nash. I told him I did not know anything about the handkerchief, when he asked me if I found it; and if he says I told him it was destroyed, that is a false statement. If he says I told him there was blood on the handkerchief, that statement is false. I backed the car out from Perry's place."

Considerable time is taken up in cross-examination as to the streets he traveled in taking Allen home, and why he drove up and down certain streets; but the cross-examination of the witness is in substance the same as the witness testified in chief. It is not deemed necessary to set it out in detail in this record, as the most of it is immaterial to the issues joined in the case.

Douglas Haltom, one of the defendants on trial with Jack Dowell, testifying for the defendants, stated:

"I am one of the defendants. In the early part of the night of January 22, 1938, I was at Smith's Cafe. I was busy at that time myself. After 1:30 or 2 o'clock on the morning of January 23, 1938, and after I closed my business, I went to Smith's Cafe, which is on North Grand. I don't know the street number. It is the first block off the Square on the west side of the street. I remained there about an hour and a half, and then I went to Perry's Cafe. I first saw Jack Dowell at Perry's Cafe. Somewhere around 5:30 in the morning, he came over to the booth where me and Mr. Allen was sitting in the booth. Jack and Mr. Allen was talking. Shorty. Allen is my partner in the cafe business. Our cafe was in the same block with Smith's, just a small restaurant. Shorty Allen was at Perry's Cafe. It could have been before 5:30. Allen wanted to go home, and wanted a cab. Jack Dowell was there at the time. Allen asked me if I thought Jack would drive him home. Jack said he was driving another fellow's car. I didn't know the name. I didn't know Coppock at that time very well, just when I saw him. Jack went over and talked to some one in another booth about it, and then came back and said he would take Allen home. We all went out, me, Allen, and Jack Dowell. We started out North Grand, the three of us in the car. Jack was driving. The car was parked in the alley, north of Perry's Cafe. It was a Ford V8, 1934 Model Coupe. We went out north to the Tia Juana. We went on to Shorty Allen's house. It is a way out, pretty close to the cemetery. I don't know the number of the house. We let him out there; and Jack and I came back to Perry's Cafe. Jack was driving the car all the time from the time we left Perry's Cafe to take Allen home until we got back to the cafe. We came down Grand. The only conversation Jack and I had, he wanted to know if I wanted to go home. I asked him where he was going. He said he was going to Perry's, and I said that would be all right, and I would get off there. We came down, I don't know how far, and then cut over to Independence, and went up Independence to the Square, came back a block east, and turned left, and came back down to Perry's north. I got out at the alley there by Perry's. Jack Dowell, the defendant in this case, had the keys. I did not have any key. This, I would say, was about a quarter to six o'clock in the morning of the twenty-third of January, 1938. I didn't look

at the time. That is my best judgment. Jack went in at Perry's. I started to go across the street, and changed my mind, and came back, and went into Perry's. Jack went in first. I drank a bottle of beer, I believe, at the counter. I played one of these marble machines that you put a nickle in and play it. There were several persons in the cafe at the time. After I watched them playing the marble machine, I went over to Smith's. I got to Smith's, as near as I can fix it, about 6:15 or 6:30. I saw Bill Caldwell at Smith's Cafe. He was drinking a bottle of beer, and asked me to have one with him. I sat down and drank a bottle of beer. I went from there up to my place of business, which is just a few doors away; and then went up to my room, which is upstairs above my place of business, and went to bed. I slept until about six o'clock in the evening. I did not work Sunday night. The place is not open on Sunday night. I was arrested the next day at my room. I know Mr. Collins who runs the barbecue stand at 1106 East Broadway. I have known him about ten months or a year. I worked for him at one time, a little more than two months ago. I worked about nine or ten months. I was on the day shift during the time I worked at Jim's Barbecue. I opened up at six o'clock. I knew where the stock and where the cash register and where the money was kept. I was trusted with the money while I worked at the barbecue stand. I have had as much as $75 or $100 in my possession. When I quit, Mr. Collins and I were friendly. The reason for my quitting there, Mr. Collins said he would have to cut wages, and I told him that I couldn't stand a cut. He told me to go ahead and finish out the week at the same salary I had been receiving. Mr. Collins had some marble machines and music boxes in the restaurant while I was working there. I checked with him lots of times, the money that was taken out of those machines. There had been over $30 lots of times. The machines often had more money than the money drawer. The scratch I had on my hand was made by a potato peeler. I was not at the barbecue stand with Jack Dowell or any other person on the morning it was alleged the place of business was robbed. I did not take the cigarettes. I was not in that part of town at the time alleged. I was not with Jack Dowell any time that day and up until the time I took Shorty Allen home. I am familiar with the driveway on the east side of the barbecue stand. There is kind of a red shale looking stuff in there,

I don't know what you call it. It packs hard. A number of people drive through this driveway. Every body that wants to can drive through this alley. Taxi drivers and police cars drive through the alley. I have seen cars go through there after I would open up of a morning. Trucks go through the alley, customers of the barbecue stand go in there, and often have curb service. The potato peeler, with which I cut my hand is an oval-shaped knife, about half oval-shaped, and has a little knife in there that peels them so thin; and I scratched my hand on it. It is kind of a half circle. I am left handed, and it is more difficult to peel this potato peeler with the left hand, because the grooves would turn the wrong way. Lon Nash is my father-in-law. My father-in-law and I are not friendly. It had been more than a month prior to the time of this alleged offense since my father-in-law and I had spoken. I had a fuss with him at the barbecue stand. I don't remember the date. It was before this happened, approximately 30 days. He came out to where I was working, and had been drinking. He came down to the jail right away after my arrest. I talked to him in the visiting room of the jail. My wife told me Nash wanted to come and that he had something to tell me. I said it would be all right; and he came in. He said he was sorry, and asked me if I was guilty; I told him I was not; and he replied, 'I hope you are not.' I did not tell him I got the goods out of the country that night, or anything else about the goods. He apologized for the trouble that me and him had had, and that was all that was said."

On cross-examination the witness stated that the trouble he had had with his father-in-law was over his wife. "My wife is the daughter of Lon Nash."

On cross-examination the testimony of the witness is in substance the same as his direct testimony. The cross-examination of the witness covers several pages. The most part of the cross-examination is on immaterial matters to the offense upon which Dowell and Haltom were on trial for.

Glenn Moulton, a witness for the defendant, stated:

"I live at 1005 North Davis in the city of Enid. At the present time I am employed by the Dixie Cab Company. I am acquainted with Jack Dowell. I was with the Dixie Cab Company on the 22d day of January, 1938, driving for the company. I was staying that night at Perry's Cafe, which is beyond the First National Bank Building here in the city of Enid. About 5:30 on the morning of the 23d of January, 1938, I was leaving the cafe to go and check. I left about that time or shortly before 5:30. I check in at 5:30. We change shifts at 5:30 in the morning; and I check in at 5:30. I checked in that morning at 303 East Broadway, that is the Dixie Office. I drove my cab from Perry's Cafe over to the cab office, and checked in. I checked in shortly after 5:30. The best I can fix it, I got back to Perry's Cafe from checking in twenty or twenty-five minutes to six o'clock. I had been in and out of Perry's place all evening after ten o'clock. I had seen Douglas Haltom around Perry's several times, also Jack Dowell. I was at Perry's Cafe when Jack, Douglas, and Shorty Allen left. My cab was parked at the north edge of the alley at the Nash Finch building. I saw a Ford coupe parked there, but I did not know whose it was. I went out in my car through the alley. I did not back out. All the conversation I heard, Jack told somebody he was going to take Shorty Allen home. When I came back to the cafe after driving over to the office, Jack Dowell and two fellows with him were sitting in a booth near the front. I have known him five or six years. I did not know either of the fellows Jack was sitting in the booth with. I didn't know who the Ford parked in the alley near my car belonged to. When I came back, I paid no attention; I do not know whether the Ford car was there at that time or not. I left Perry's Cafe between 6:15 and 6:30. When I drank the cup of coffee, a lady waited on me; and I learned afterwards it was a Mrs. Davis."

On cross-examination the statements of the witness in substance are the same as his direct examination as to the time he was at the Perry Cafe, when he left there, and when he returned, and as to Jack Dowell being there when he left, and being there when he returned.

Mart Quertermous, testifying for the defendant, stated:

"I live at the Ardena Rooms in the city of Enid. I am an automobile mechanic. I worked for the Black and White Taxi Cab Company for six years. I have known Jack Dowell four or five years. I just know Douglas Haltom when I see him. On January 23, 1938, Sunday morning, I was in the Perry Cafe. I was first in there about five o'clock in the morning. George Page and his girl were with me. Jack Dowell was not in there when I first went in. I left there and went to George Page's house and got my car. I went with George in his car. I went back to the Perry Cafe about 5:30. Jack Dowell came in about five or ten minutes after I got there. He was sitting in a booth, talking to Buddy Kiely and Happy Coppock. Happy was pretty drunk. Jack Dowell came in and sat down in the booth where I was sitting. I think it was about a quarter to six when Jack came in. I saw Jack come in and sit down; within a short time he asked if I wanted anything to eat, and I told him I would take a bowl of vegetable soup, and we went over to the counter. Mrs. Homer Davis waited on us. I have known her four or five years. She was working at Perry's Cafe at the time. I stayed in the cafe until about 7. Jack was in there all the time—the biggest part of the time. Jack was with me from the time we had the bowl of soup until after 7 o'clock, there in the cafe. It was right around 6 o'clock when we ate the soup. I saw Douglas Haltom the first time I was in the cafe, which was about 5 o'clock in the morning. Jack worked for the same cab company I do. I had been out that night to a dance. I drank a bottle of beer or so that night; I didn't drink anything else. Buddy Kiely was in the cafe when Jack came in. He was sitting in the booth with me. When Jack came in, Buddy went somewhere to the back. I did not see Douglas Haltom come in the cafe right after Jack did."

Virgil Tubbe stated:

"I live at 1026 East Market. I have lived in Enid more than five years. I am a cab driver for the Black and White Cab Company. I was driving for the company on the 23rd day of January, 1938. I am acquainted with Mrs. Wilma Davis, and was acquainted with her on January 23rd. On that date we lived at 2203 North Washington street. She had the back part of the house; and my wife and I had the front part, the same house only different

apartments. At that time Mrs. Davis was working at Perry's Cafe. She reported to the cafe on the morning of the 23rd of January, 1938, 10 or 15 minutes to 6 o'clock in the morning. A cab always comes for me; and on Sunday morning she would ride down with me. I had to be at work at 6 o'clock (I had been working at the Black and White Taxi Cab Company); she, at 10 minutes to 6. Mrs. Davis rode down with me that Sunday morning. She got out of the cab and went into Perry's Cafe. I had a call, and I went back to Perry's Cafe about 10 or 15 minutes after six o'clock. When I got back to Perry's Cafe, taking the party that called as he wanted to eat his breakfast, Jack Dowell was in there. It was about 20 minutes after 6 o'clock. There were other people in the cafe, but I don't remember whether I saw Douglas Haltom. I noticed Jack, because he drove for the cab company."

On cross-examination the witness stated: "Jack worked at the same place I did."

The witness further stated that Mrs. Davis drove down that morning, and that he got to town between 10 and 15 minutes to 6 o'clock.

Bill Caldwell, testifying for the defendant, stated:

"My name is Bill Caldwell. I am a cook. I know Douglas Haltom. I cook at the Enid Cafe at the present time. On the 23rd of January, 1938, I was at Smith's Cafe. Douglas Haltom was in the Smith Cafe several times during the night. After midnight he was in a couple of times that I remember seeing him. I quit work at six o'clock in the morning, if I quit on time. I hardly ever quit on time. Immediately after I quit, I changed clothes. I went to the counter and was waited on by the waitress. I drank a bottle of beer. Shortly after I drank the bottle of beer, I saw Douglas Haltom. He came to the door and came in. He and I drank a bottle of beer, and he went to his place. He came in the Smith Cafe around 6:30."

Defendant asked to recall Lon Nash for further cross-examination, and stated to the court that he desired to recall him for the purpose of asking a question:

"If he went to a party by the name of Howard Dyer and tried to employ him to go to Jack Dowell and Douglas Haltom, and get information about the alleged burglary at Collins' Barbecue stand, and that he promised to pay the said Howard Dyer if he could get any information out of them?" Defendant alleged said fact happened; and if he did not answer that he had made this promise to Howard Dyer, defendant wished to rebut the state's testimony of Lon Nash by Howard Dyer. This was objected to; and the offer was denied by the objection of the county attorney. The court sustained the objection, and refused to let the witness be recalled by the defendant's counsel.

Perry Lee Randolph, testifying for the defendant, stated:

"My name is Perry Lee Randolph. I live at 1709 East Main street. On the morning of January 23, 1938, I was working at Perry's Cafe in the city of Enid. My hours are from nine at night until six a.m. On the morning of January 23, 1938, I went off work at 6 o'clock. Mrs. Wilma Davis took my place. I am acquainted with Jack Dowell. He was in and around the place the morning of January 23, 1938. Jack Dowell and Douglas Haltom came in about 5 o'clock, and left, and came back. Jack was in there about 10 minutes of 6, when Mrs. Davis came to work. He was sitting over in the booth. Mrs. Davis came in and picked up a dime over in front of the cigarette machine; and I remember Jack making some remark about it. I cannot remember whether or not Douglas Haltom was in there then. There was a crowd, and I did not know Douglas Haltom very well; but I do know Jack pretty well; and that was about 10 minutes until 6 o'clock. When I got off, there was another boy over there; and we went over to the booth, and sat there, and talked. Buddy Kiely, my cousin, was in there at the same time; he drove me home about 7 o'clock. Jack Dowell was there all of that time."

On cross-examination she was asked when it was that Jack Dowell and Douglas Haltom came in the restaurant. She answered:

"About 5 or 5:30. Jack was in the cafe when Mrs. Davis came in and picked up the dime. Mrs. Davis went on duty at 6 o'clock; and this was before she went on duty. I got off at 6 o'clock; and Jack had remained there all of the time until I left there at 7 o'clock. I was sitting in the booth with Buddy Kiely and Jack. There were quite a few in the restaurant that morning. Jack Dowell was there until I left the restaurant. I had worked there about four months. Jack had been a customer of the place. I had lived at Okeene 17 years before I came to Enid. I live with my mother. Douglas Haltom came into the restaurant about 5 o'clock; and I remember that he was sitting in there when I went out at 7 o'clock. I only know Douglas Haltom when I see him. When Mrs. Davis came in and picked up the dime, I remember that Jack said: 'We have been sitting here all this time, and that dime laying there, and you walk right in the door and pick it up.'"

On re-cross-examination the witness stated that she had talked to Jack Dowell about the case, but had not talked to Douglas Haltom. "It was shortly after it happened that I talked with Jack."

The witness on re-cross-examination admitted that she had been married, and had been divorced about eight months.

Mrs. Wilma Davis, testifying for the defendant, stated:

"My name is Wilma Davis. I lived at 2203 North Washington street. On January 23, 1938, I was working at Perry's Cafe here in Enid, on North Grand. I had been working there for about ten months. I know Jack Dowell; I have a passing acquaintance with Douglas Haltom. Jack had been eating in the cafe sometime before January 23, 1938, being a customer of the cafe. I went on duty on the morning of January 23, 1938, about 10 minutes until 6 o'clock. I go to the cafe on week days with my husband, and on Sunday I come down in a cab with Virgil Tubbe. I have known Virgil Tubbe three or four years. I also know his wife. They had an apartment in my home. I went down to work with Virgil. I reached the cafe that morning at 10 minutes until 6

o'clock. Virgil let me out of the cab; and he went away, and came back later, and had a cup of coffee. It was after 6 when I served him the coffee. When I went in the cafe, Jack Dowell was in there, in the second booth from the front, facing the door. As I walked in, I saw a dime in front of the door, on the floor, that some one had dropped. I reached to pick it up; and Jack was sitting in the second booth, and said: 'Mrs. Davis, I have been sitting here all this time, and you come in here and pick up the dime.' I said: 'Yes, I pick up all I see'; and we laughed about it. There was with Jack at the time, Mart and Happy. I don't believe I know Mart's last name; but I believe Coppock is Happy's last name. I went to work that morning at six o'clock. After I went to work, Jack and Mart came to the counter; and I served them. They both had soup. Jack was there; and I served him a bottle of beer around 7 o'clock."

On cross-examination the witness stated that Perry Lee Randolph's shift ended when she commenced that morning at six o'clock. "To the best of my knowledge they remained in the cafe about an hour. I don't remember whether I saw Douglas Haltom or not. There was quite a crowd; and as there was nothing to make me remember Douglas Haltom being there, I don't remember it. I remember Jack, Happy, and Buddy Kiely, and Virgil Tubbe; that is about all, I think. I don't remember Douglas Haltom. I came to work with Virgil Tubbe; he brought me to work in a taxi cab. Virgil, I, and the taxi cab driver came down in the cab together. It was not Virgil's cab; it was another driver who came after us. It is my custom when I go into the restaurant to look at the clock to see if I am on time, and had looked at the clock that morning. It was 10 minutes to 6. I know Lottie Dobbs. She works at Perry's Cafe, and cooks during the daytime."

Lottie Dobbs, testifying for the defendant, stated that she lived about seven miles south on 81 Highway and one mile east.

"I have been in the county about 28 years. I know the location of Perry's Cafe. I am the mother of the

proprietor of that cafe. Harry and I operate the cafe. I work every day. I get there about 4 o'clock or 10 minutes after 4 every morning. I know Wilma Davis. She doesn't work there now. She did, but she is under the doctor's care now, Dr. Hudson. She was working on the 23rd day of January, 1938. Her hours were from 6 in the morning until 3 in the afternoon. On the 23rd of January, 1938, she was at the restaurant 10 or 15 minutes before 6 o'clock. I always help clean up on Sunday morning; and she came in the door and picked up a dime. She just laughed, and went on to get her coffee. At that time I was in front with the booths. I have known Jack Dowell off and on for a year or two. He was in the second booth from the front. Mart Quertermous was with him."

On cross-examination she stated that:

"I get to the restaurant every morning about 10 minutes after 4 o'clock. I usually get off work about 15 minutes to 4 o'clock. My duty is to look after the cooking in the restaurant. There were several in the restaurant when I came in. I do not know Douglas Haltom personally. I saw Mrs. Davis come in that morning. When I was told about them picking Jack up, I said: 'Why, Jack sat right over there in that booth while I did the sweeping'; and that is all I ever said. I saw the clock, and was standing right in front of it when Mrs. Davis came in. On Sundays our large breakfast is from 4 to 6 o'clock in the morning. People that have been out to dance, come in and eat, and go home and go to bed. We also have transients and travelers."

The foregoing is the substance of the testimony of the state and the defendant.

The defendant Jack Dowell has assigned 15 errors alleged to have been committed by the trial court:

(1) That the trial court erred in overruling the motion of the plaintiff in error for a new trial.

(2) That the verdict is contrary to the law.

(3) That the verdict is contrary to and not supported by the evidence.

(4) The court erred in admitting evidence that was incompetent, irrelevant, and immaterial, over the objection of the plaintiff in error.

(5) That the court erred in overruling the demurrer of the plaintiff in error to the state's evidence.

(6) That the court erred in denying the motion of the plaintiff in error for a directed verdict at the close of the state's evidence.

(7) That the court erred in overruling the demurrer of the plaintiff in error at the close of all the evidence.

(8) That the court erred in denying the plaintiff in error's motion for a verdict directing the jury to acquit the defendant at the close of all the testimony.

(9) That the court erred in refusing the attorney for the plaintiff in error the right to examine the said Lon Nash.

These assignments, herein set out, are the only assignments of error that it is deemed necessary for this court to consider in order to prepare an opinion in this case. In fact, the motion for a new trial covers all the assignments of error; and they will be treated together.

The testimony in this case relied upon by the state is purely circumstantial. No one saw the defendant, or the party charged with him, in or near the place of business of John Collins, known as Jim's Barbecue, any time during that part of the morning of January 23, 1938, when it is alleged that this cafe, known as Jim's Barbecue, was robbed.

The testimony is specific on behalf of the state that the door to this place of business, known as Jim's Barbecue, was opened at 13 minutes until 6 o'clock on the morning of January 23, 1938; and that time is fixed specifically by an electric clock that was in the restaurant; and the testimony shows that when the cord was

broken or disconnected from the clock, the clock immediately stopped, and had stopped at 13 minutes until 6 o'clock.

Jack Dowell lived in the city of Enid, as well as the defendant Douglas Haltom. Jack was a driver for the Black and White Taxi Cab Company, and was generally known around the places of business as a cab driver. Douglas Haltom, according to the testimony, was not as well known as Jack.

The circumstance upon which the state relies for a conviction is that in the alley, where everybody that wanted to drive through there by Jim's Barbecue, day or night, was found a track made by a peculiar car casing, the tread of which had been regrooved with a peculiar marking. Two or three days after the burglary, Happy Coppock's car was found parked somewhere on the street; and it was discovered that this car had a casing that had been regrooved, and seemingly identical with the track of the casing that was found in the alley.

Further it was shown by the state that a man by the name of Lon Nash, who was the father-in-law of Douglas Haltom, went to the jail. Nash claims to have had a conversation with the defendant Jack Dowell, in which he asked Dowell where the things were that he and Haltom had taken from Jim's Barbecue the night they burglarized it. He states that Jack didn't know, and said they were probably out of the United States by that time. Nash admitted that he was angry with his son-in-law, Douglas Haltom, and that they seldom spoke. He gives no reason why he went to talk to the defendant Jack Dowell, except that he was there as a volunteer.

The foregoing is the substance of the state's testimony, circumstantial and positive.

The statement of Nash as to what was said by the defendant was not made by the defendant under oath;

neither had he solicited a conversation with the witness Nash; and it was not such a statement that would indicate anything definite, as to the burglary, or anything tending to connect the defendant with the burglary. It is a statement, if true as made by Nash, of an evasive, indefinite, and uncertain statement made by the defendant, seemingly for the purpose of not desiring to talk to the witness Nash.

The defendant, while on the witness stand, denied positively that he had any such conversation with the witness Nash, or that he made any such statement, as testified to by Nash.

The night of the alleged burglary the defendant had driven Happy Coppock's car (with the consent of Happy) and taken a man by the name of Shorty Allen, who was intoxicated, to his home; and then, so far as the proof shows, came back to Perry's Cafe, and remained there until after 6 o'clock in the morning. Not only one, but several witnesses, testified positively that he was there from 5:30 or early in the morning until 6 o'clock. One of the waitresses working in Perry's Cafe, who went off duty at 6 o'clock in the morning, testifies positively that Jack Dowell the defendant was in the restaurant prior to the time she went off duty, and that she always went off duty at 6 o'clock in the morning. The lady, Wilma Davis, who succeeded her, went on duty at 6 in the morning. Mrs. Davis testifies that she got to the restaurant 10 minutes before 6 o'clock, the time that she should go on duty, and that when she went in the restaurant, she looked at the clock, and saw that it was 10 minutes until 6; and as she went in by the marble machine, she picked up a dime from the floor, and that she and the defendant in this case, Jack Dowell, had some conversation about her finding the dime after they had been sitting there for some time and not seeing it.

Several other parties testified to the defendant being there in Perry's Cafe for some time prior to 6 o'clock, and for some time thereafter. The only time that the defendant is connected with the car of Happy Coppock is the time he drove Shorty Allen home for about 17 blocks, and then returned; and as he stated, which is not disputed by any one, he parked the car again in the place where he found it, and had nothing further to do with the Coppock car.

The state insists that the Coppock car had a casing on it with tread similar to the one that was seen in the alley running along by Jim's Barbecue, belonging to John Collins.

Mrs. Lottie Dobbs, one of the proprietors of Perry's Cafe, testifies that she got to the cafe on Sunday morning, the 23rd of January, 1938, about 4 o'clock, and that she went to work shortly thereafter, and was sweeping and cleaning up, as it was Sunday morning; and usually on Saturday night they have a heavy trade, and that it took some time to clean up; that the defendant came into the restaurant shortly after she got there, 5 or 5:30, and was there at the restaurant until after Mrs. Davis, one of the employees of the restaurant, came in and had gone to work. Mrs. Davis went to work at 6 o'clock that morning.

Perry Lee Randolph, who went off duty at 6 o'clock in the morning, testifies in substance to the same facts, and says that the defendant was there when Mrs. Davis came in, and had been for some minutes; and that he did not leave until after she went off duty, which was at 6 o'clock. She also referred to the fact of Mrs. Davis finding the dime on the floor, and to the conversation had between Mrs. Davis and the defendant as to Mrs. Davis finding the dime.

The question of conviction upon circumstantial evidence has been before this court several times, beginning

with Sies v. State, 6 Okla. Cr. 142, 117 P. 504. In the first paragraph of the syllabus the court said:

"Where the evidence is wholly circumstantial, and the facts and circumstances in evidence are of such a character as to fairly permit an inference consistent with innocence, it cannot be regarded as evidence sufficient to support a conviction."

In the second paragraph the court said: "The facts and circumstances proved must not only be consistent with and point to the guilt of the defendant, but they must be inconsistent with his innocence."

It is contended by the plaintiff in error that the verdict is contrary to law and the evidence in the case. We are of the opinion that this contention is well founded. All defendants are presumed to be innocent until proven guilty beyond a reasonable doubt; and no inference of guilt can be founded upon circumstances, except such as naturally or necessarily follow from the facts. If the facts and circumstances are of such a character as to fairly permit an inference consistent with innocence, they cannot be regarded as sufficient to support a conviction.

The general rule in criminal cases is that where the evidence is circumstantial, the facts shown must not only be consistent with and point to the guilt of the defendant, but must be inconsistent with his innocence.

The only circumstance shown by the state in this case in any way tending to connect the defendant is that the defendant Dowell sometime about four or five o'clock in the morning drove Happy Coppock's car, and took Shorty Allen home. This car, they claim, had a tread on it similar to the marks of the tread of a car that had passed through the alley near Jim's Barbecue building that was burglarized at about thirteen minutes to 6 o'clock in the morning of January 23, 1938. The defendant is not shown to have been anywhere near this barbecue building or place of business that was burglarized;

but it is shown that after he took Shorty Allen home, he came back to Perry's Cafe and remained there until after 6 o'clock in the morning. He was in there, as shown by the various witnesses in this case,. from shortly after 5 o'clock until near 7 o'clock.

The defendant admits that he drove Happy Coppock's car, and took Shorty Allen home, but says that he came back and parked the car at the same place where it was parked before be borrowed the car to take Allen home. No one disputes that fact. The state makes no effort to contradict the defendant's testimony.

The evidence of the state in this case amounts to nothing more than a suspicion of the guilt of the defendant, and is insufficient to sustain a conviction. Suspicion is not proof; and the trial court in this case should have directed a verdict of acquittal.

There is no evidence offered by the state tending to show that the defendant was in the neighborhood of Jim's Barbecue on the morning of January 23, 1938, when it was burglarized; nor is there any evidence showing that any of the property taken from the barbecue stand was found in the possession of the defendant, or any one else who secured possession from the defendant. In other words, the state fails completely to connect the defendant by any circumstance sufficient to warrant this court in sustaining the judgment.

A person on trial, charged with a crime, is by law presumed to be innocent until his guilt is established beyond a reasonable doubt; and no inferences can be founded upon suspicion, except such as are natural and follow from the facts. If the facts and circumstances are not of such a character as to fairly permit an inference inconsistent with innocence, they cannot be regarded as sufficient to support a conviction. Nash v. State, 8 Okla. Cr. 1, 126 P. 260.

In Davis v. State, 18 Okla. Cr. 112, 193 P. 745, following the holding of this court in its early opinions, this court held in the third paragraph of the syllabus that:

"The appellate court cannot safely permit a judgment of conviction to stand unreversed, where one material element of the offense rests alone upon evidence which amounts merely to suppositions or suspicions of guilt."

In Davis v. State, supra, in the body of the opinion the court said:

"It is incumbent upon the state to prove every essential element of the crime by evidence beyond a reasonable doubt, and a conviction based upon circumstances which raise merely suspicions of guilt should not be allowed to stand." Tro v. State, 27 Okla. Cr. 418, 228 P. 530; Adams v. State, 38 Okla. Cr. 173, 259 P. 665.

In Starr v. State, 63 Okla. Cr. 302, 74 P. 2d 1174, this court adhered to the former rulings, and stated in the second paragraph of the syllabus as follows:

"It is encumbent upon the state to prove every essential element of the crime by evidence beyond a reasonable doubt, and a conviction based upon circumstances which raises merely suspicions of guilt should not be allowed to stand."

In the third paragraph the court states:

"Where the evidence only raises a suspicion of the guilt of the accused, it is insufficient to sustain a conviction. Suspicion is not proof, and the court should direct a verdict under such circumstances."

The circumstantial evidence introduced by the state is wholly insufficient to sustain a judgment against this defendant for burglary; and the motion for a directed verdict at the close of the state's evidence and his demurrer and motion at the close of all the evidence for an instructed verdict on the ground that the evidence was insufficient to sustain a conviction was well taken;

and the court erred in overruling both motions and the demurrer.

For the failure of the state to introduce proof sufficient to sustain the judgment, the case is reversed and remanded.

DOYLE, P. J., and BAREFOOT, J., concur.